**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |
|---|---|
| FOGO DE CHAO | ) |
| CHURRASCARIA, LLC | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | )   Civil Action No. 10-1024 (RBW) |
|  | ) |
| U.S. DEPARTMENT OF | ) |
| HOMELAND SECURITY, <u>et al.</u> | ) |
|  | ) |
| Defendants. | ) |

---

## <u>MEMORANDUM OPINION</u>

This case, which implicates the Immigration and Nationality Act, 8 U.S.C. § 1101

(2006), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 (2006), is currently

before the Court on the parties' cross motions for summary judgment.  For the following reasons,

the Court must grant the defendants' motion for summary judgment and deny the plaintiff's

motion for summary judgment.[1]

## I.  BACKGROUND

### A.  The Immigration and Nationality Act of 1990

The Immigration and Nationality Act of 1990 sets forth the criteria under which foreign

nationals may receive immigrant or nonimmigrant visas in order to lawfully study, work, or

---

[1]     In addition to the filings already identified, the Court considered the following filings made by the parties:
(1) the Plaintiff's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Pl.'s
Mem."); (2) the defendants' Memorandum of Points and Authorities in Support of Defendants' Cross-Motion for
Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Mem."); (3) the
Plaintiff's Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment and in Opposition to
Defendants' Cross-Motion for Summary Judgment ("Pl.'s Reply"); and (4) the Defendants' Reply in Support of
Cross-Motion for Summary Judgment ("Defs.' Reply").

reside in the United States.  8 U.S.C. § 1151.  Among the various visas granting access to the

country is one for a nonimmigrant individual

> who, within 3 years preceding the time of his application for admission into the
> United States, has been employed continuously for one year by a firm or
> corporation or other legal entity or an affiliate or subsidiary thereof and who seeks
> to enter the United States temporarily in order to continue to render his services to
> the same employer or a subsidiary or affiliate thereof in a capacity that . . .
> involves specialized knowledge.

Id. § 1101(a)(15)(L).  The Act provides further that "an alien is considered to be serving in a

capacity involving specialized knowledge with respect to a company if the alien has a special

knowledge of the company product and its application in international markets or has an

advanced level of knowledge of processes and procedures of the company."  Id. § 1184(c)(2)(B).

And the Act's implementing regulations define specialized knowledge as:

> knowledge possessed by an individual of the petitioning organization's product,
> service, research, equipment, techniques, management, or other interests and its
> application in international markets, or an advanced level of knowledge or
> expertise in the organization's processes and procedures.

8 C.F.R. § 214.2(l)(1)(ii)(D).  The United States Customs and Immigration Service ("USCIS"),

which is part of the Department of Homeland Security, has further interpreted specialized

knowledge "through historical precedent decisions and numerous internal policy memoranda."

See Administrative Record ("AR") at 5 (citing Matter of Penner, 18 I&N Dec. 49 (Comm'r

1982); Memorandum of James A. Puleo, Executive Assoc. Comm'r, Immigration and

Naturalization Service, Interpretation of Special Knowledge (Mar. 9, 1994) ("Puleo

Memorandum"); Memorandum of Fujie Ohata, Director, Service Center Operations, USCIS,

Interpretation of Specialized Knowledge for Chefs and Specialty Cooks Seeking L-1B Status

(Sept. 9, 2004) ("2004 Ohata Memorandum").[2]  Nonimmigrant, intracompany transferee visas

for individuals possessing specialized knowledge are commonly known as "L-1B" visas.  See,

e.g., AR at 3.

For an individual to obtain an L-1B visa, the American company that seeks to hire the

employee "must file a petition on Form I-129, Petition for Nonimmigrant Worker."  8 C.F.R. §

214.2(l)(2)(i).  Among other types of evidence, the petition must be accompanied by

> [e]vidence that the alien will be employed in a[] . . . specialized knowledge
> capacity, including a detailed description of the services to be performed, . . .
> [e]vidence that the alien has at least one year of continuous full-time employment
> abroad with a qualifying organization within the three years preceding the filing
> of the petition, [and] [e]vidence that the alien's prior year of employment abroad
> was in a position that . . . involved specialized knowledge and that the alien's
> prior education, training, and employment qualifies him/her to perform the
> intended services in the United States; however, the work in the United States
> need not be the same work which the alien performed abroad.

8 C.F.R. § 214.2(l)(3)(ii)-(iv).

**B.  Fogo de Chao**

The plaintiff, Fogo de Chao ("Fogo"), owns and operates a chain of churrascarias, or

Brazilian steakhouses, in several locations in both Brazil and the United States.  AR at 842.  Its

first United States restaurant opened in 1997 in Dallas, Texas, and "[t]oday, Fogo has

steakhouses in six locations in Brazil, and in sixteen cities throughout the [United States]."  Id. at

843.  The staff of each steakhouse includes "genuine Brazilian gaucho chefs (known as

churrasqueiros), who grew up as gauchos in the rural pampas region of Southern Brazil."  Id.

The churrasqueiros, "specialize[] in churrasco, a traditional method of preparing and serving

---

[2]       In 2003, many of the functions performed by the Immigration and Naturalization Service of the Department
of Justice "were transferred to the newly-created Department of Homeland Security," of which the USCIS is a part.
United States v. Villanueva-Sotelo, 515 F.3d 1234, 1250 n.3 (D.C. Cir. 2008) (citing 6 U.S.C. § 271(b)).
Memoranda issued by the former Immigration and Naturalization Service are used by the USCIS.  See, e.g., AR at 5,
26.  For simplicity, the Court refers to all such memoranda as issuing from the USCIS.

meat that descended from the gauchos or cowboys of the Rio Grande do Sul region of southern Brazil." Id. at 3 n.2.

The chefs at Fogo begin their careers by training for at least two years at one of the Brazilian steakhouses, after which certain chefs are chosen for potential transfer to restaurants in the United States. Id. at 843. Specifically, Fogo "selects as L-1B candidates its best-performing genuine gaucho churrasqueiros who express an interest in the transfer, and who have worked a minimum of two years in Fogo's restaurants in Brazil and have completed the training program there." Id. at 849.

### C.  The Gasparetto Petition

Fogo chose Rones Gasparetto as an L-1B transferee candidate after he expressed interest in a transfer, id. at 849, and then filed an L-1B visa petition (the "Gasparetto Petition") with the Vermont Service Center of the USCIS on his behalf on February 4, 2010, id. at 81-322, 359. In the petition, Fogo represented that, "[l]ike all of [its] other churrasqueiros in Brazil, Mr. Gasparetto is a genuine gaucho, born and raised in the Rio Grande do Sul region," and "[h]e has well more than two years' experience as a churrasqueiro in Fogo Brazilian restaurants." Id. at 849. Fogo represented also that Mr. Gasparetto had "completed the training program in Brazil." Id.

Thereafter, the USCIS "determined that the petition . . . was not approvable on the record; that [the] petitioner had not met the burden of persuasion; and that additional evidence was needed." Id. at 359. The USCIS then "issued a[] [Request for Evidence] on February 19, 2010, . . . which explained that [the] USCIS had reviewed the case and found insufficient evidence that the beneficiary [Mr. Gasparetto] was eligible for L status as an intracompany transferee in a position requiring or involving specialized knowledge." Id.; see also id. at 323-

4

25.  Fogo responded to the Request for Evidence on May 5, 2010.  Id. at 326-57.  The "USCIS re-reviewed the record in light of [Fogo's] response but concluded that [Fogo] still had not established" that Mr. Gasparetto was eligible for an L-1B visa, and thus denied the petition on May 20, 2010.  Id. at 360.

Fogo filed a motion with the USCIS to reconsider the denial, but later requested to withdraw the motion.  Id. at 360-61.  The USCIS then reopened the petition "on its own motion" on October 25, 2010, id. at 361, 545, and Fogo responded to that motion on April 26, 2011, id. at 361, 373-538.  The response included "a submission of new arguments and additional evidence." Id. at 361.  The USCIS again found, "[a]fter a complete review of the record of proceeding, . . . that the grounds for denial ha[d] not been overcome," and therefore reaffirmed the denial of the Gasparetto Petition.  Id. at 371.

Because the USCIS also found that "th[e] case involves an unusually complex or novel issue of law or fact," the decision was "certif[ied] . . . to the Administrative Appeals Office (AAO)."  Id.  In doing so, the "USCIS [sought] clarification on application of regulation to the particular fact pattern presented by petitions filed by Fogo . . . for specialized knowledge intracompany transferees for the position of churrasqueiro and for [Mr. Gasparetto] in particular."  Id.

The Administrative Appeals Office considered Fogo's submissions, including its initial filing and the sixteen attached exhibits, id. at 9, the additional information submitted in response to the Request for Evidence, id. at 13-14, and supplemental briefs and additional evidence submitted directly to the Office, id. at 4.  In its decision, the Office addressed

> (1) what is the appropriate standard that should be applied to determine "specialized knowledge"; (2) whether [Fogo's] churrasqueiro chef position requires specialized knowledge according to that standard; and (3) whether [Mr.

Gasparetto] . . . possesses specialized knowledge, and has been and will be employed in a specialized knowledge capacity.

Id. at 21.  The Office first found that specialized knowledge could not be determined using a bright-line test, but rather that "Congress created a standard that requires [the] USCIS to make a factual determination that can only be determined on a case-by-case basis, based on the agency's expertise and discretion."  Id. at 36.  The Office found also that Fogo "failed to corroborate its claims that the Brazilian employees possess knowledge or perform duties that are uncommon or different compared to those generally performed by churrasqueiro chefs in the Brazilian churrascaria restaurant industry."  Id. at 51.  With respect to Mr. Gasparetto in particular, the Office found that he did not possess specialized knowledge, but rather that he "possesses general cultural knowledge, values, and culinary skills acquired as a result of his upbringing in a rural area of Rio Grande do Sul and due to his family and community traditions."  Id. at 40. Additionally, the Office noted that the Gasparetto Petition, Fogo's supporting documentation and its legal submissions "neither addressed nor attempted to clarify th[e] discrepancy" between Mr. Gasparetto's "foreign position of 'garcon churras' or 'churrasqueiro waiter' and the proffered position of 'churrasqueiro chef.'"  Id. at 41.  Thus, the Office found that "the record as presently constituted does not clearly document that [Mr. Gasparetto] completed the foreign entity's 24-month training program, or that such training was followed by one year of employment as a churrasqueiro chef in the foreign entity's restaurants," even though "[t]hese are [Fogo's] stated minimum qualifications for transfer of its Brazilian churrasqueiro chefs to the United States."  Id. at 41; see also id. at 50.  Finally, the Office was "not persuaded that [Mr. Gasparetto's] inherent qualities give him 'special knowledge of [Fogo's] product,' as opposed to general knowledge of his native regional culture gained through life experience."  Id. at 41-42.  Accordingly, the Office affirmed the denial of the Gasparetto Petition.  Id. at 54.

**D. The Current Lawsuit**

Although Fogo instituted the current action after the initial denial of the Gasparetto

Petition, the parties filed a joint motion to stay the proceedings while the defendants

reconsidered the petition.  See ECF No. 30; March 28, 2011 Minute Order (granting stay of

proceedings).  Upon the Administrative Appeals Office's final adjudication affirming the denial

of the petition, the parties filed a joint status report agreeing that:

> the remaining claims to be resolved on staggered cross-motions for summary
> judgment are Fogo's challenge to the actions taken by [the] [d]efendants with
> respect to Fogo's L-1B petition on behalf of Mr. Gasparetto, including but not
> limited to the [Administrative Appeals Office's] October 3, 2011 decision,
> affirming the [Vermont Service Center's] June 16, 2011 denial of that petition.
> Such challenge is grounded in: (1) the Immigration and Nationality Act (8 U.S.C.
> [§] 1101 et seq.) . . . , its implementing regulations, and memos and analyses of
> the [d]efendants interpreting such authority, and (2) the [APA], including all
> arguments applicable under that statute and its case law.

ECF No. 34 at 2.  The parties subsequently filed cross motions for summary judgment, which are

currently before the Court.  Fogo contends that the defendants violated the Immigration and

Nationality Act of 1990, the "specialized knowledge" regulations promulgated thereunder, and

the APA.  Pl.'s Mot. at 1-2.  The defendants contend that they complied with the APA because

the Administrative Record supports the Administrative Appeals Office's decision, and because

the decision was based on a reasonable interpretation the Immigration and Nationality Act of

1990.  Defs.' Mem. at 42.

## II.  STANDARD OF REVIEW

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether

an agency action is supported by the administrative record and consistent with the APA standard

of review."  Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010)

(citing Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007), aff'd, 408

F. App'x 383 (D.C. Cir. 2010)); see also Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir.

1977). But due to the limited role a court plays in reviewing the administrative record, the

typical summary judgment standards set forth in Federal Rule of Civil Procedure 56 are not

applicable. Stuttering, 498 F. Supp. 2d at 207. Rather, "[u]nder the APA, it is the role of the

agency to resolve factual issues to arrive at a decision that is supported by the administrative

record, whereas 'the function of the district court is to determine whether or not as a matter of

law the evidence in the administrative record permitted the agency to make the decision it did.'"

Id. (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985)). In other

words, "when a party seeks review of agency action under the APA, the district judge sits as an

appellate tribunal," and "[t]he 'entire case' on review is a question of law." Am. Bioscience, Inc.

v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote and citations omitted).

## III. LEGAL ANALYSIS

### A. Fogo's Challenge to the Defendants' Interpretation of Specialized Knowledge

Fogo argues that the Administrative Appeals Office violated the Immigration and

Nationality Act of 1990 in two ways: "(1) by improperly relying on the repudiated specialized

knowledge standard found [in] its 1987 regulations and based on the 1970 Act's legislative

history; and (2) by resurrecting evidentiary tests long-since invalidated by the 1990 Act." Pl.'s

Mem. at 30.

"When a court reviews an agency's construction of the statute which it administers, it is

confronted with two questions. First, always, is the question whether Congress has directly

spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the

matter." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984).

Thus, "[w]here . . . the plain language of [a] statute is clear, the court generally will not inquire

further into its meaning."  Qi-Zhuo v. Meissner, 70 F.3d 136, 140 (D.C. Cir. 1995).  If Congress'

intent is unclear, the court proceeds to the second step under Chevron, under which the court

must "defer to the agency's interpretation as long as it is 'based on a permissible construction of

the statute.'"  Bluewater Network v. EPA, 372 F.3d 404, 410 (D.C. Cir. 2004) (quoting Chevron,

467 U.S. at 842-43)).

As to Chevron step one, the Immigration and Nationality Act unambiguously provides

that, with certain exceptions not applicable here, "[t]he Secretary of Homeland Security shall be

charged with the administration and enforcement of [the Act] and all other laws relating to the

immigration and naturalization of aliens."  8 U.S.C. § 1103(a)(1).  Although Congress included

no statutory definition of specialized knowledge in the Immigration and Nationality Act of 1970,

it did include a definition when it enacted the Immigration and Nationality Act of 1990.  The

definition in the 1990 Act provides that "an alien is considered to be serving in a capacity

involving specialized knowledge with respect to a company if the alien has a special knowledge

of the company product and its application in international markets or has an advanced level of

knowledge of processes and procedures of the company."  8 U.S.C. § 1184(c)(2)(B).  As the

defendants correctly note, however, "[b]y defining 'specialized knowledge' as 'special

knowledge' or 'advanced knowledge,'" the plain language of § 1184(c)(2)(B) is not clear, but

rather is circular and "inherently ambiguous."  Defs.' Mem. at 19; see also 1756, Inc. v. Att'y

Gen. of the U.S., 745 F. Supp. 9, 15 (D.D.C. 1990) ("Simply put, specialized knowledge [as used

in the Immigration and Nationality Act] is a relative and empty idea which cannot have a plain

meaning.").[3]  Accordingly, the Court must look elsewhere to determine the meaning of

---

[3]       Although 1756, Inc. construed an earlier version of the Immigration and Nationality Act, the reasoning of
that case is instructive here because the subsequent iteration of the Act defined the term "specialized knowledge" in
a circular manner that renders the definition subject to various interpretations.  See, e.g., United States v. Bestfoods,

(continued . . .)

specialized knowledge.  See, e.g., United States v. Bestfoods, 524 U.S. 51, 56 (1998) ("The

phrase 'owner or operator' is defined only by tautology, however, as 'any person owning or

operating' a facility, and it is this bit of circularity that prompts our review." (citation omitted)).

In the absence of an unambiguous and plain meaning, "the court may be forced to look

to the general purpose of Congress in enacting the statute and to its legislative history for helpful

cues."  United States v. Braxtonbrown-Smith, 278 F.3d 1348, 1352 (D.C. Cir. 2002).  There are

only two pieces of legislative history that address the meaning of "specialized knowledge" as

that term is used with respect to L-1B visas.  The first is a 1970 House Committee Report, H.R.

Rep. No. 91-851 (1970), reprinted in 1970 U.S.C.C.A.N. 2750, which discusses the initial

implementation of the L-1B nonimmigrant intracompany transferee visa.  The report indicates

that the addition of such visas "would help eliminate problems [then] faced by American

companies having offices abroad in transferring key personnel freely within the organization.

This proposal would meet the objective of American industry which has been seriously

hampered in transferring personnel, particularly from Canada."  H.R. Rep. No. 91-851 (1970),

reprinted in 1970 U.S.C.C.A.N. at 2753-54.  The report further stated that "the proposed 'L'

category will not be large.  The class of persons eligible for such nonimmigrant visas is narrowly

drawn and will be carefully regulated and monitored by the Immigration and Naturalization

Service."  Id. at 2754.

Second, and as relevant here, is a 1990 House Committee Report, H.R. Rep. No. 101-

723(I) (1990), reprinted in 1990 U.S.C.C.A.N. 6710, which addresses the 1990 amendment that

introduced the statutory definition of specialized knowledge.  Fogo correctly argues that the

---

(. . . continued)
524 U.S. 51, 56 (1998); AFL-CIO v. FEC, 333 F.3d 168, 174 (D.C. Cir. 2003) ("Even if [the plaintiff] could
convince us that its alternative construction represents the more natural reading [of the statute], the fact that the
provision can support two plausible interpretations renders it ambiguous for purposes of Chevron analysis.").

legislative history indicates that Congress, in amending the provisions of the statute concerning L-1B visas, intended to broaden the visa category.  Pl.'s Mem. at 31; see H.R. Rep. No. 101-723(I) (1990), reprinted in 1990 U.S.C.C.A.N. at 6749 ("Th[e] [L] visa has been a valuable asset in furthering relations with other countries but the Committee believes it must be broadened to accommodate changes in the international arena.").  The Committee enumerated four specific ways in which the 1990 Act was intended to broaden the L visa program, namely:  (1) "allow[ing] accounting firms access to the intracompany visa"; (2) incorporating into the statute "the streamlined blanket petition available under [the then] current regulations"; (3) expanding "the requirement of employment with the company within the one-year period immediately prior to admission . . . so that the one year may be within three years prior to admission"; and (4) providing a "seven-year period of admission for managers and executives" to encourage "greater continuity for employees."  H.R. Rep. No. 101-723(I) (1990), reprinted in 1990 U.S.C.C.A.N. at 6749.  The report proceeds to separately, in the following paragraph, discuss the need for "more specificity" with respect to the meaning of specialized knowledge.  Id.  Thus, while the legislative history does indicate a broadening of the L visa category, it does not similarly indicate that the inclusion of a definition of specialized knowledge was intended as part of that broadening effort.  Indeed, the report's reference to providing "more specificity" for the meaning of specialized knowledge, as well as the acknowledgment that "[v]arying interpretations by [the Immigration and Naturalization Service] have exacerbated the problem" of the lack of specificity, id., point only to Congress' intent to reconcile and harmonize the interpretation of the statute.  Fogo's arguments to the contrary are unavailing.

The "more specific" definition contained in the report is the same as the definition in the statute itself: "special knowledge of the company product and its application in international

markets, or an advanced level knowledge of processes and procedures of the company." Id.; see also 8 U.S.C. § 1184(c)(2)(B). The legislative history thus does nothing to aid the Court in determining Congress' intent concerning the meaning of specialized knowledge.

The Court must therefore proceed to Chevron step two. Under this step, if

> the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Chevron, 467 U.S. at 843 (footnotes omitted). But "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Id. at 843 n.11.

The Department of Homeland Security, through its USCIS component, has interpreted the term specialized knowledge both through the regulations discussed above, and in the Puleo and Ohata Memoranda. The Puleo Memorandum states:

> Since the statutory definitions and legislative history [of the Immigration and Nationality Act of 1990] do not provide any further guidelines or insight as to the interpretation of the terms "advanced" or "special", officers should utilize the common dictionary definitions of the two terms as provided below.

> Webster's II New Riverside University Dictionary defines the term "special" as "surpassing the usual; distinct among others of a kind." Also, Webster's Third New International Dictionary defines the term "special" as "distinguished by some unusual quality; uncommon; noteworthy."

> Based on the above definition, an alien would possess specialized knowledge if it was shown that the knowledge is different from that generally found in the particular industry. The knowledge need not be proprietary or unique, but it must be different or uncommon.

> . . . .

Further, Webster's II New Riverside University Dictionary defines the term "advanced" as "highly developed or complex; at a higher level than others." Also, Webster's Third New International Dictionary defines the term "advanced" as "beyond the elementary or introductory; greatly developed beyond the initial stage."

Again, based on the above definition, the alien's knowledge need not be proprietary or unique, merely advanced. Further, the statute does not require that the advanced knowledge be narrowly held throughout the company, only that the knowledge be advanced.

Defs.' Mem., Exhibit ("Ex.") A (Puleo Memorandum) at 1-2.

Another 2002 memorandum, authored by former Director of Service Center Operations at

the USCIS, Fujie Ohata, reiterates:

The alien should possess a type of specialized knowledge or advanced knowledge that is different from that generally found in the particular industry. The knowledge need not be proprietary or unique. Where the alien has specialized knowledge of the company product, the knowledge must be noteworthy or uncommon. Where the alien has knowledge of company processes and procedures, the knowledge must be advanced. Note, the advanced knowledge need not be narrowly held throughout the company. Further, there is no test of the US Labor Market in determining whether an alien posses[ses] specialized knowledge. Only an examination of the knowledge possessed by the alien is necessary.

. . . .

Requests for additional evidence for specialized knowledge cases should not run contrary to the 1994 [Puleo] Memorandum on specialized knowledge.

Defs.' Mem, Ex. B (Memorandum of Fujie Ohata, Director, Service Center Operations, USCIS,

Interpretation of Specialized Knowledge (Dec. 20, 2002) ("2002 Ohata Memorandum")) at 1-2.

Finally, a 2004 Ohata Memorandum, which specifically addresses "Chefs and Specialty

Cooks seeking L-1B status," states:

Chefs or Specialty Cooks generally are not considered to have "specialized knowledge" for L-1B purposes, even though they may have knowledge of a restaurant's special recipe or food preparation technique.

. . . .

[A]n important factor, for L-1B purposes, is the degree to which the alien's knowledge contributes to the uninterrupted operation of the specific business for which the alien's services are sought.  In adjudicating a petition involving a chef, it is therefore necessary to consider not only how skilled the chef is and whether or not his or her skills are common to other chefs, but also the role the chef plays within the petitioning organization and the impact his or her services would have on the operations of the U.S.-based affiliate.  For example, a chef in a themed restaurant may be required to perform functions ancillary to cooking food such as singing or entertaining in a particular manner.  In deciding whether those responsibilities constitute specialized knowledge, it would be necessary to assess the length and complexity of in-house training required to perform such duties.  This assessment is necessary in order to determine the amount of economic inconvenience, if any, the restaurant would undergo were it required to train another individual to perform the same duties.

. . . .

To qualify as "specialized knowledge," the knowledge of the product or the process must be of the sort that is not generally found in the particular industry, although it need not be proprietary or unique.  Further, the knowledge must be of a certain complexity.

. . . .

The following are examples of scenarios in which a Chef or Specialty Cook would not be considered to possess specialized knowledge:

Example 1

> The petitioner claims that a particular type of ethnic cooking represents the culmination of centuries of cooking practices and that some dishes are at least a millennium old.  The petitioner also states that there are subtle nuances in cooking the same item that give the dish with the same name a different taste.  The petitioner further lists the process in order to explain the expertise needed to accomplish these tasks and the need for a highly trained chef, starting from choosing the ingredients until the final product is delivered.

Recipes and cooking techniques that can be learned by a chef through exposure to the recipe or cooking techniques for a brief or moderate period of time generally do not constitute specialized knowledge.  Despite the petitioner's claims that this particular style of cooking is ancient and has subtle nuances to it that must be learned, these claims do not generally establish that these skills are so uncommon or complex that other chefs in the industry could not master them within a reasonable period of time.

> The petitioner, therefore, has failed to show that it would cause significant economic inconvenience were it not allowed to employ the alien in L-1B classification.

Defs.' Mem., Ex. C (2004 Ohata Memorandum) at 1-3.

It is well understood that "[d]eference in accordance with Chevron . . . is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'"  Gonzales v. Oregon, 546 U.S. 243, 255-56 (2006) (quoting United States v. Mead Corp., 533 U.S. 218, 226-27 (2001)).  And "[i]f the agency's interpretation is 'reasonable,' then it is entitled to deference."  McGrady v. Mabus, 635 F. Supp. 2d 6, 14 (D.D.C. 2009) (citing Sierra Club v. EPA, 536 F.3d 673, 677 (D.C. Cir. 2008).  Courts have found dictionary definitions helpful in determining whether an agency's interpretation is reasonable.  See, e.g., Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 666-67 (2007); Int'l Bhd. of Teamsters v. U.S. Dep't of Transp., __ F.3d __, __, 2013 WL 3836237, at *6 (D.C. Cir. 2013) (finding that "the agency reasonably concluded that the ordinary meaning of" a statutory term was the definition found in Webster's New International Dictionary).

As noted above, Congress has unambiguously deferred to the expertise of the Department of Homeland Security, and in turn the USCIS, to implement the Immigration and Nationality Act of 1990.  8 U.S.C. § 1103(a)(1).  And the USCIS relied on dictionary definitions to provide greater clarity to the term specialized knowledge.  Defs.' Mem., Ex. A (Puleo Memorandum) at 1-2.  In the absence of a clear statutory definition of specialized knowledge, and given that the relevant legislative history evidences only that Congress intended for the USCIS to use a consistent definition for specialized knowledge, it cannot be said that the Puleo Memorandum

and the Ohata Memoranda constitute an unreasonable interpretation of the specialized

knowledge provisions of the Immigration and Nationality Act of 1990.

The Court's review of the Administrative Record in this case reveals that, in reviewing

the Gasparetto Petition, the Administrative Appeals Office relied on the Puleo Memorandum and

the Ohata Memoranda, as well as a reasoned interpretation of the statutes, legislative history, and

applicable regulations.  See, e.g., AR at 4-6, 28-37.  Accordingly, the Court finds that the USCIS

interpretation of the term specialized knowledge, as used by the Administrative Appeals Office

in the Gasparetto Petition, is reasonable, and thus is entitled to Chevron deference.

Fogo argues that the Administrative Appeals Office's position that "'there is no

indication that Congress intended to liberalize the L-1B visa classification' . . . is untenable as a

matter of logic."  Pl.'s Mem. at 30 (quoting AR at 32).  Fogo points to the fact that Congress'

definition of specialized knowledge in effect "'removed two elements from [the 1987] regulatory

definition of'" specialized knowledge, "'and that such elements likely had the effect of

restricting the class of people eligible for the classification.'"  Id. at 31 (quoting AR at 32)

(emphasis deleted).  Fogo notes also that "it is undisputed that Congress did not impose any new

requirements to offset those two deletions."  Id.  Fogo recasts this same argument—that

Congress intended the Immigration and Nationality Act of 1990 to broaden the scope of the L-

1B visa—in several different ways throughout its initial memorandum of law.  Id. at 30-36.

Although it is true that Congress' statutory definition of specialized knowledge differed from the

former regulatory definition of specialized knowledge, it does not follow that Congress intended

to liberalize or broaden the scope of the L-1B visa in the manner advanced by Fogo.  Rather, as

discussed in detail above, the legislative history indicates only that Congress intended for there

to be "more specificity" and coherence in the USCIS's interpretation of specialized knowledge.

H.R. Rep. No. 101-723(I) (1990), reprinted in 1990 U.S.C.C.A.N. at 6749.

Fogo argues also that Congress' enactment of Public Law Number 111-230 indicates an intent to broaden the scope of the L-1B visa category. Pl.'s Mem. at 32. The relevant portion of Public Law Number 111-230 provides in its entirety that

> (a) Notwithstanding any other provision of this Act or any other provision of law, during the period beginning on the date of the enactment of this Act and ending on September 30, 2014, the filing fee and fraud prevention and detection fee required to be submitted with an application for admission as a nonimmigrant under section 101(a)(15)(L) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(L)) shall be increased by $2,250 for applicants that employ 50 or more employees in the United States if more than 50 percent of the applicant's employees are nonimmigrants admitted pursuant to section 101(a)(15)(H)(i)(b) of such Act or section 101(a)(15)(L) of such Act.

> (b) Notwithstanding any other provision of this Act or any other provision of law, during the period beginning on the date of the enactment of this Act and ending on September 30, 2014, the filing fee and fraud prevention and detection fee required to be submitted with an application for admission as a nonimmigrant under section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(H)(i)(b)) shall be increased by $2,000 for applicants that employ 50 or more employees in the United States if more than 50 percent of the applicant's employees are such nonimmigrants or nonimmigrants described in section 101(a)(15)(L) of such Act.

> (c) During the period beginning on the date of the enactment of this Act and ending on September 30, 2014, all amounts collected pursuant to the fee increases authorized under this section shall be deposited in the General Fund of the Treasury.

Act of Aug. 13, 2010, Pub. L. No. 111-230, § 402, 124 Stat. 2485, 2487-88 (providing emergency supplemental appropriations for border security for the 2010 fiscal year). Although the legislation clearly contemplates the possibility of there being an employer with "more than 50 percent of [its] employees" working in the United States as "nonimmigrants admitted pursuant to . . . section 101(a)(15)(L)," id., nowhere does it state that Congress desired to increase the number of nonimmigrant intracompany transferees. Quite the opposite, the fact that

the legislation imposes a fine on employers who hire a large number of nonimmigrant

intracompany transferees could indicate that Congress intended <u>to deter</u> the practice of hiring

large numbers of such individuals.

Fogo contends also that the evidentiary tests used by the Administrative Appeals Office

to evaluate the Gasparetto Petition violated the terms of the Immigration and Nationality Act of

1990.  Pl.'s Mem. at 37; Pl.'s Reply at 32-35.  Specifically, Fogo argues that, "[i]n requiring

Fogo to make [a] showing" that "it can 'stake an ownership claim' in Mr. Gasparetto's special

knowledge," the Administrative Appeals Office "impos[ed] the long-since invalidated

'proprietary knowledge' test in violation of the 1990 Act."  Pl.'s Mem. at 37.  It is true that,

according to the Puleo Memorandum, "[t]he [specialized] knowledge [possessed by an L-1B visa

beneficiary] need not be proprietary or unique, but it must be different or uncommon."  Defs.'

Mem., Ex. A (Puleo Memorandum) at 1.  However, even if Fogo is correct that the

Administrative Appeals Office applied a proprietary knowledge test, the Office denied the

Gasparetto petition on separate grounds.  In its own submissions to the Administrative Appeals

Office, Fogo argued that it imparted "specialized knowledge" to potential L-1B visa

beneficiaries through a special training program.  <u>See, e.g.</u>, AR at 68 ("The special knowledge

required for the position is one that involves (i) first-hand, personal knowledge and upbringing in

the gaucho lifestyle of Rio Grande do Sul region in Southern Brazil; <u>and</u> (ii) successful

completion of an extensive training program by Fogo de Chao's tenured, experienced

<u>Churrasqueiro</u> Chefs." (emphasis added)).  But the Administrative Appeals Office found that

Fogo had failed to submit documentation regarding Mr. Gasparetto's completion of the training

program.  <u>Id.</u> at 40.  Accordingly, even if the Administrative Appeals Office erred by requiring

Fogo de Chao to effectively show "proprietary knowledge," that error was harmless.[4]  See PDK

Labs. Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004) ("In administrative law, as in federal civil

and criminal litigation, there is a harmless error rule: § 706 of the Administrative Procedure Act,

5 U.S.C. § 706, instructs reviewing courts to take 'due account . . . of the rule of prejudicial

error.'  If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it

would be senseless to vacate and remand for reconsideration.").

Fogo next contends that the Administrative Appeals Office "violate[d] the 1990 Act by

requiring Fogo to show that [Mr. Gasparetto] . . .  has skills different from Fogo's other

churrasqueiros."  Pl.'s Mem. at 39.  Specifically, Fogo argues that "[t]here is no legal basis to

require this comparison—which amounts to a requirement that the beneficiary (here, Mr.

Gasparetto) must have more 'specialized knowledge' than Fogo's other Brazilian

churrasqueiros."  Id. at 40 (emphasis deleted).  Fogo further cites the Puleo Memorandum's

instruction that "the test for specialized knowledge involves only an examination of the

knowledge possessed by the alien."  Id. (citing AR at 915) (emphasis deleted).  These

characterizations of the Puleo Memorandum and the Administrative Appeals Office's decision

are misleading.  Although the Puleo Memorandum does indeed require "only an examination of

---

[4]     In any event, Fogo's arguments ignore the language of the Immigration and Nationality Act of 1990, which specifically refers to a "special knowledge of the company product . . . or  . . . an advanced level of knowledge of processes and procedures of the company."  8 U.S.C. § 1184(c)(2)(B) (emphasis added); see also AR at 39 n.6.  This language unambiguously indicates that specialized knowledge, regardless of how that term is interpreted by the USCIS, must be related to the employer's product, processes, or procedures.

     Further, and perhaps more important, it is axiomatic that courts have a "duty 'to give effect, if possible, to every clause and word of a statute.'"  Duncan v. Walker, 533 U.S. 167, 174 (2001) (quoting United States v. Menasche, 348 U.S. 528, 538-39 (1955)).  Were the Court to adopt Fogo's logic, then other provisions of the Immigration and Nationality Act of 1990 would be rendered mere surplussage.  As noted in the Administrative Appeals Office's decision, "the Act provides separate nonimmigrant visa classifications for aliens with culturally unique skills and those who are coming to the United States for the purpose of employment involving the sharing of the history, culture and traditions of their countries of nationality."  AR at 39 n.6 (citing 8 U.S.C. §§ 101(a)(15)(P)(iii), 101(a)(15)(Q)).  If L1-B visas could be granted on the basis of specialized knowledge of a culture as Fogo's arguments indicate, Pl.'s Mem. at 37-39, there would be no need for specific visa categories addressing employment based on cultural knowledge.

the knowledge possessed by the alien," the Memorandum goes on to direct "officers adjudicating petitions involving specialized knowledge [to] ensure that the knowledge possessed by the beneficiary is not general knowledge held commonly throughout the industry but that it is truly specialized."  AR at 915.  Undoubtedly, other <u>churrasqueiro</u> chefs employed by Fogo are members of the same industry, and so it follows that a comparison to others in Fogo's workforce was reasonable.

Fogo next argues that the Administrative Appeals Office "cannot require Fogo to show uniqueness, which was previously required under the 1970 Act."  Pl.'s Mem. at 41.  Fogo contends that the Office nonetheless required Fogo to show uniqueness by imposing a showing that Mr. Gasparetto's knowledge was "different or uncommon," that Fogo's "<u>churrasqueiro</u> chefs differ from other <u>churrasqueiro</u> chefs," and that Fogo itself is "distinguished by some unusual quality that sets [it] apart from others in the industry."  <u>Id.</u> at 42 (citing AR at 44-47).  These arguments do not hold water.  Fogo argues in essence that, in using words somewhat similar to the word "unique," the Administrative Appeals Office required a showing of uniqueness. However, the words used by the Office are words used in the Puleo Memorandum, Defs.' Mem., Ex. A (Puleo Memorandum) at 1-2 (defining special as, among other things, "distinguished by some unusual quality; uncommon; noteworthy"), which in turn relies in part on dictionary definitions of the word "special."  The fact that these words are similar to the word unique does not mean that the Administrative Appeals Office applied a uniqueness test.  Indeed, the dictionary definition of unique is much more stringent.  <u>See</u> Webster's Third International Dictionary 2500 (1981 ed.) (defining unique as "being the only one: sole" and "being without a like or equal: single in kind or excellence: unequaled").  The word "special," as defined in the Puleo Memorandum, requires only comparative distinction.  The word "unique," on the other

hand, requires superlative distinction.  Put differently, while something "special" must be somehow more, better than the norm, or, as the dictionary and the Puleo Memorandum indicate, "uncommon" compared to others of its kind, something "unique" must be the best or only one of its kind.

Finally, Fogo argues that the Administrative Appeals Office should not have relied on a Fifth Circuit Court of Appeals decision, Boi Na Braza Atlanta, LLC v. Upchurch, 194 F. App'x 248 (5th Cir. 2006), which affirmed the "denial of L-1B petitions brought on behalf of certain Brazilian chefs trained to cook in the gaucho manner."  Pl.'s Mem. at 42 (citing Boi Na Braza; AR at 53-54).  Any similarities between the case before this Court and Boi Na Braza aside, the Court notes first that, after extensive discussion and before ever addressing the merits of Boi Na Braza, the Administrative Appeals Office stated that "[b]ased on the evidence presented, it is concluded that the beneficiary does not possess specialized knowledge, nor would the beneficiary be employed in a capacity requiring specialized knowledge.  For this reason the [Administrative Appeals Office] will affirm the director's decision to deny the petition."  AR at 51.  In any event, the Administrative Appeals Office did not err insofar as it relied on Boi Na Braza.  In that case, the district court found that the agency's "decisions [denying L-1B visa petitions for churrasqueiro chefs] were not arbitrary, capricious or an abuse of discretion," but rather "detailed the requirements of 8 C.F.R. § 214.2(l)(1)(ii)(D), as well as the agency's interpretive memoranda, applied the record evidence to the regulations, considered the applicable legislative history and reached a logical result after an adequate treatment of the issues presented."  Boi Na Braza Atlanta, LLC v. Upchurch, No. 3:04-CV-2007-L, 2005 WL 2372846, at *10 (N.D. Tex. Sept. 27, 2005), aff'd, 194 F. App'x 248.  While Fogo is correct that "[n]either the District Court nor the Fifth Circuit in Boi Na Braza found that churrasqueiros in general lack

'specialized knowledge,'" Pl.'s Mem. at 42, both courts did find that the agency had not acted in an arbitrary or capricious manner when it denied the L-1B visa petitions because of the agency's careful consideration of the evidence and applicable law in that case, <u>Boi Na Braza</u>, 2005 WL 2372846, at *10; <u>Boi Na Braza</u>, 194 F. App'x at 249 ("In particular, the agency could rationally have concluded that plaintiff did not provide the [US]CIS with sufficient information about the beneficiaries' skills and abilities, nor did it demonstrate that the beneficiaries' knowledge of Brazilian cooking was sufficiently specialized to merit L-1B status.").  Here, the Administrative Appeals Office made reference to the evidentiary "deficiencies that led the Fifth Circuit Court of Appeals" to affirm the district court in <u>Boi Na Braza</u>, and then noted that the evidence presented in the Gasparetto Petition similarly failed to "document [Mr. Gasparetto's] training or clarify the discrepancy with respect to his job title or role with the foreign entity."  AR at 54.  The Office did not, as Fogo suggests, use the <u>Boi Na Braza</u> decision to reach the conclusion that no <u>churrasqueiro</u> chefs could ever be granted L-1B visa.

In short, the Court finds that the Administrative Appeals Office's interpretation of the term "specialized knowledge," as used in the Gasparetto Petition, is reasonable and thus entitled to <u>Chevron</u> deference.[5]

---

[5]     Another member of this Court recently found that the USCIS is entitled to <u>Chevron</u> deference in its interpretation and application of statutes and regulations when reviewing visa petitions.  <u>See, e.g.</u>, <u>Int'l Internship Programs v. Napolitano</u>, 853 F. Supp. 2d 86, 97 (D.D.C. 2012) (Leon, J.), <u>aff'd</u>, 718 F.3d 986, 988 (D.C. Cir. 2013) (affirming without deciding whether the USCIS interpretations are entitled to <u>Chevron</u> deference).  However, even if <u>Chevron</u> does not apply, the decision would still be entitled to the deference under the less deferential <u>Skidmore</u> standard.  <u>See, e.g.</u>, <u>Boi Na Braza</u>, 2005 WL 2372846, at *6-*10 (citing, among others, <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944); <u>United States v. Mead Corp.</u>, 533 U.S. 218, 235 (2001)), <u>aff'd</u>, 194 F. App'x 248.  Under the <u>Skidmore</u> standard, courts defer to agency decisions that have the "power to persuade" based on the decision's "thoroughness, logic, and expertness, its fit with prior interpretations and any other sources of weight."  <u>Mead</u>, 533 U.S. at 235; <u>see also</u> <u>Skidmore</u>, 323 U.S. at 140.  Upon this Court's review of the Administrative Appeals Office's decision concerning the Gasparetto Petition, and for the same reasons for which the Court finds that <u>Chevron</u> deference is appropriate, the Court finds also that the decision was sufficiently thorough, logical, and persuasive to merit deference under <u>Skidmore</u> and <u>Mead</u>.

**B.  Fogo's Contention that the Defendants Violated the APA**

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The 'arbitrary and capricious' standard of review as set forth in the APA is highly deferential," and the Court must therefore "presume the validity of agency action."  Am. Horse Prot. Ass'n v. Yeutter, 917 F.2d 594, 596 (D.C. Cir. 1990).

Fogo argues first that the defendants violated the APA because the Administrative Appeals Office's decision "violates the 1990 Act and the 1991 Regulations" and is therefore "not in accordance with law."  Pl.'s Mem. at 43.  However, as extensively discussed above, the Administrative Appeals Office's interpretation of the Immigration and Nationality Act of 1990 and its underlying regulations are reasonable and entitled to deference.  The Court, therefore, finds that the defendants' interpretations did not violate the APA.

Fogo argues next that the "USCIS violated the APA by adversely prejudging, on the record, all Fogo 'specialized knowledge' petitions."  Pl.'s Mem. at 43.  In particular, Fogo notes that the defendants stated in a brief filed with this Court that "[i]n view of [the] USCIS's determination that these individuals do not qualify for L-1B 'specialized knowledge' visas and therefore that such visa petitions will not be approved in the future, the parties are at an impasse."  Id. (quoting ECF No. 18 at 7) (emphasis deleted).  Fogo relies on Cinderella Career & Finishing Sch., Inc. v. FTC, 425 F.2d 583 (D.C. Cir. 1970), in which the Circuit vacated an FTC order and required the recusal of then FTC Chairman Paul Rand Dixon, id. at 592.  In that case, the Circuit chastised Chairman Dixon for ignoring court mandates and repeatedly making public speeches indicating that he had prejudged specific actions pending before the FTC.  Id. at 590-92.  Here, on the other hand, Fogo has identified a single statement in a single brief.  Pl.'s Mem.

at 43.  Further, the statement was made in the midst of the defendants' assertions that they did

not want to enter into a settlement with Fogo that "would bind the [a]gency's future exercise of

discretion, and would guarantee an outcome with respect to [the] [p]laintiff's visa petitions."

ECF No. 18 at 8.  Although potentially troubling, the defendants' representation that the USCIS

would not approve future L-1B visa petitions similar to Mr. Gasparetto's does not rise to the

level of the arbitrary and capricious action demonstrated in Cinderella Career & Finishing

Schools, Inc.  Indeed, it is possible that the defendants were referring only to petitions that, like

Mr. Gasparetto's, failed to present the requisite evidence for a finding of specialized knowledge.

And the defendants' own statements concerning the importance of preserving the USCIS's

ability to exercise its discretion in the future, ECF No. 18 at 8, belie the notion that the USCIS

has foreclosed the possibility approving any future L-1B visa petitions from Fogo.

 Fogo argues next that the "USCIS violated the APA because its failure to explain its

departure from the precedent of Fogo's 251 prior approvals was arbitrary and capricious."  Pl.'s

Mem. at 44.  However, the defendants are correct that the regulations require the USCIS to make

"[a] determination of statutory eligibility . . . only on information contained in the record of

proceeding which is disclosed to the applicant or petitioner."  8 C.F.R. § 103.2(b)(16)(ii).  Thus,

regardless of the previous approvals, the USCIS would be justified in denying a petition if the

information upon which it relied did not provide sufficient evidentiary support to warrant

granting an L-1B visa petition.  And indeed, as the Administrative Appeals Office stated and as

discussed above, the Gasparetto Petition failed to "document [Mr. Gasparetto's] training or

clarify the discrepancy with respect to his job title or role with the foreign entity."  AR at 54.  In

other words, the evidence before the Administrative Appeals Office concerning the Gasparetto

Petition was insufficient for the Office to find that Mr. Gasparetto was eligible for an L-1B visa. The prior approvals are therefore of no moment.

Fogo contends that the USCIS "violated the APA by failing to conduct notice and comment rulemaking before it effectively revised its definitive interpretation of the specialized knowledge term in 2007 . . . . [as] embodied in the Puleo Memo[random]." Pl.'s Mem. at 47. It is true that, "[w]hen an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." Alaska Prof'l Hunters Ass'n v. FAA, 177 F.3d 1030, 1034 (D.C. Cir. 19199). And so, as Fogo points out, Pl.'s Mem. at 47, a problem would exist if the USCIS had "depart[ed] from established precedent without a reasoned explanation," ANR Pipeline Co. v. FERC, 71 F.3d 897, 901 (D.C. Cir. 1995); see also Northpoint Tech., Ltd., v. FCC, 412 F.3d 145, 156 (D.C. Cir. 2005) ("A statutory interpretation . . . that results from an unexplained departure from prior [agency] policy and practice is not a reasonable one."). Here, however, the Administrative Appeals Office did not depart from an earlier agency interpretation, but instead relied heavily on both a reasoned interpretation of the relevant statute and regulations as well as the Puleo Memorandum throughout its decision. See generally AR at 1-54. And in doing so, as discussed above, the essential problem with the Gasparetto Petition was one of insufficient evidence.[6] Id. at 54. Accordingly, the Court cannot find that the USCIS acted in an arbitrary and capricious manner in its resolution of the Gasparetto Petition without employing notice and comment.

---

[6]     The Court will not entertain Fogo's arguments concerning the appropriateness of the Administrative Appeals Office's decisions in other adjudications. See Pl.'s Mem. at 17-19. The only issue before the Court is whether the Office complied with the APA by reasonably interpreting the Immigration and Nationality Act of 1990 with respect to the Gasparetto Petition. The Office's interpretation of other matters not before the Office when it considered the Gasparetto Petition are irrelevant here.

Fogo also argues that the USCIS decision concerning the Gasparetto Petition was arbitrary and capricious because it failed to consider evidence that Mr. Gasparetto completed the training program.  Pl.'s Mem. at 50.  Specifically, Fogo notes that the Gasparetto Petition included an affidavit signed by Fogo's CEO that indicated that Mr. Gasparetto had completed the training program.  Id. (citing AR at 849).  To be sure, agencies are required to consider relevant evidence during their decision making processes.  See, e.g., Tenneco Gas v. FERC, 969 F.2d 1187, 1214 (D.C. Cir. 1992).  However, it is equally true that the requirement that an agency consider and rely on the evidence in the record is not "intended to negative the function of the [agency] as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).  Here, the Administrative Appeals Office, in exercising its discretion, found that the evidence presented by Fogo was insufficient.  AR at 54.  And as the defendants note, while the Office "does not disregard evidence because it is 'self-serving,' it requires the introduction of corroborative testimonial and documentary evidence, where available."  Defs.' Reply at 23 (emphasis in original) (citing Matter of S-A-, 22 I. & N. Dec. 1328, 1332 (June 27, 2000); AR at 47 n.8).  Thus, although Fogo is correct that there was no evidence contradicting the CEO's affidavit, it cannot be said that the agency's decision was arbitrary and capricious where Fogo failed to provide any other corroborative evidence.

Finally, Fogo argues that "the [Administrative Appeals Office's] findings—regarding competitors' use of gaucho culture and tradition, the incidence of Fogo's cooking method and style of service across the industry, and the culinary skills required for an authentic churrascaria—are impermissible because these are facts that 'concern' Fogo's petition with no

basis in the record."  Pl.'s Mem. at 52.  While an agency must make findings based on the "testimony and exhibits, together with all papers and requests filed in the proceeding," the APA provides that a party is entitled the opportunity to rebut a fact that does "not appear[] in the evidence in the record" only where that fact is "material."  5 U.S.C. § 556(e) (emphasis added).  And, as noted several times above, the Administrative Appeals Office determined that the Gasparetto Petition lacked sufficient evidence that Mr. Gasparetto possessed specialized knowledge because it was unclear from the record that he had completed the required training program, and because Fogo failed to clarify the nature of Mr. Gasparetto's foreign position.  AR at 41, 54.  Accordingly, even if the USCIS considered evidence outside of the record, such considerations were not material to the ultimate finding that Mr. Gasparetto did not possess specialized knowledge and thus is ineligible for an L-1B visa.

## IV.  CONCLUSION

For the reasons stated above, the Court finds that the denial of the Gasparetto Petition was neither arbitrary nor capricious. Accordingly, the Court grants the defendants' motion for summary judgment and denies Fogo's motion for summary judgment.[7]

SO ORDERED this 9th day of August, 2013.

REGGIE B. WALTON
United States District Judge

---

[7] The Court will contemporaneously issue an Order consistent with the Memorandum Opinion.